**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

**CASE NO.:**

UBS FINANCIAL SERVICES INC.,

     Plaintiff,

v.

ANDREW PLUM, THOMAS
CULLEN, KATHLEEN BURKE, and
TAYLOR MARSH,

     Defendants.

---

**VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF**

Plaintiff UBS Financial Services Inc. ("UBS") as for its Verified Complaint against Defendants Andrew Plum ("Plum"), Thomas Cullen ("Cullen"), Kathleen Burke ("Burke"), and Taylor Marsh ("Marsh") (collectively "Defendants"), hereby alleges as follows:

**PRELIMINARY STATEMENT**

1.    Until their abrupt resignation on September 19, 2025, Defendants were the key members of a highly successful financial advisor team in UBS's West Palm Beach office, servicing UBS clients with assets of more than $1.4 billion and generating annual revenues for UBS in excess of $9 million.

2.    Known as the 440 Group, the team had existed for more than a decade at UBS and had previously included a number of other senior financial advisors. These senior financial advisors left the industry in the recent past and turned over their client relationships to Defendants to continue servicing at UBS.

3.    These client relationships were transitioned to Defendants as "Receiving FAs" under UBS's Aspiring Legacy Financial Advisor ("ALFA") program.  The ALFA program gives

UBS financial advisors the opportunity to inherit clients as Receiving FAs from other UBS financial advisors, known as Legacy FAs, who are exiting the financial services industry. The Legacy FAs receive payments over a five-year period based on the revenues generated by the accounts.

4.      As a condition of inheriting clients under the ALFA program, Receiving FAs are required to sign an ALFA Receiving FA Agreement in which they agree, among other things, not to solicit the inherited clients ("ALFA Accounts") for a specified period of time should they leave UBS.

5.      Defendants inherited clients as Receiving FAs from three former teammates who exited the industry under the ALFA program. Virtually all of the UBS clients serviced by Defendants (and holding $1.4 billion in assets at UBS) were subject to the non-solicitation restrictions in ALFA Receiving FA Agreements signed by one or more of the Defendants.

6.      The ALFA Receiving FA Agreements at issue here were signed in 2019, 2022, and 2023 respectively. That means the Legacy FAs were still receiving payments under the 2022 and 2023 ALFA agreements at the time of Defendants' resignation and were entitled to continue receiving payments through 2027 and 2028 under the 5-year payment period of those agreements. In short, any breach by Defendants of the non-solicitation covenants in their ALFA Receiving FA Agreements would injure not just UBS but also their former teammates, the Legacy FAs.

7.      Since their resignation on September 19 and notwithstanding the obvious injury their actions are causing to both UBS and the Legacy FAs, Defendants have been soliciting ALFA Accounts to move their assets to the new start-up firm, Loxahatchee Capital ("Loxahatchee"), which Defendants secretly formed while working for UBS. Loxahatchee is affiliated with Elevation Point Wealth Partners, LLC, a registered investment adviser firm.

8.      Defendants' solicitation of UBS clients started, at minimum, immediately after their resignation. UBS began receiving account transfer notices on Monday, September 22, the first business day after the Defendants' Friday, September 19 resignation. UBS received 22 account transfer requests on September 23, the second business day after Defendants' resignation, including for 17 accounts for Defendants' largest client. UBS has continued receiving transfer requests in the ensuing days. All of the transferred accounts are ALFA Accounts that Defendants are prohibited from soliciting under the ALFA Receiving FA Agreements they signed.

9.      Defendants are using unfair tactics in their efforts to move business out of UBS. Even though their new firm Loxahatchee is a start-up, Defendants are representing to the investing public on the home page of the new firm's website that Loxahatchee has been servicing clients since 1992:



Home | Loxahatchee Capital.

10.     None of the Defendants have been in the financial services industry since 1992, let alone serving the clients in question since that date. Instead, "since 1992" appears to refer to one of the Legacy FAs from whom they inherited clients under the ALFA program, who started in the business in 1992. Defendants are apparently not content just to try to take his former clients; they are also taking credit for his experience.[1]

_____

[1] An alternate explanation is that the Legacy FA in question is secretly planning to join Defendants at Loxahatchee, which would be a flagrant violation of the agreement he signed with UBS

11.     This misrepresentation of their new firm's experience is not surprising given that clients will necessarily be unfamiliar with the new firm. Any attempt by Defendants to characterize their contacts with UBS clients since their resignation as mere announcements, which Defendants freely admit initiating, is simply not credible. They are plainly selling their new firm and indeed misleading clients in the process.

12.     Defendants' solicitation of clients began immediately after resigning from UBS or possibly even before. Several hours after his resignation, Defendant Andrew Plum called one of the Legacy FAs and told him that the entire group was leaving UBS "and so are my clients." Defendant Plum also told the Legacy FA that they had been working on the transition for eight months.

13.     Upon information and belief, Defendants' breach of their duties by UBS also included misappropriation of confidential UBS client information. In the weeks leading up to their resignation, Defendants and the sales assistants on their team printed thousands of pages of documents containing highly confidential UBS client information, including the systematic printing on September 8, 2025, of more than 1,100 pages of client account statements by team sales assistant Joan Davis (now with Loxahatchee). UBS searched the team's office space after their resignation and did not find the client statements printed by Ms. Davis.

14.      The timing and nature of the printing strongly suggest that some of the documents were printed and taken by Defendants to be used for their transition to Loxahatchee, rather than for any legitimate UBS business purpose. While Defendants have denied taking the information, the printing is nonetheless highly suspicious and suggests that Defendants have misappropriated confidential UBS information.

15.     Defendants' misconduct in violation of the multiple agreements they signed has already caused UBS significant harm. As of the filing of this action, clients with more than $200 million in assets formerly managed by Defendants have already submitted transfer requests to move their accounts to Defendants' new firm.

16.     In addition, Defendants' actions are hurting the Legacy FAs, who expected to receive payments under the ALFA arrangements for several years to come. The transfer of accounts from UBS to Defendants' new firm means that the accounts will not generate revenue at UBS, which in turn means that the Legacy FAs will not receive the income they counted on receiving after their separation from employment.

17.     The transfer requests and the irreparable harm to UBS and the Legacy FAs will continue without this Court's intervention.

18.     UBS brings this action to enforce Defendants' contractual promises, protect its customers, goodwill, and confidential information, and prevent irreparable injury to its business.[2]

19.     Defendants' blatant and unabated disregard for their contractual obligations and fiduciary duties have caused and are continuing to cause irreparable harm to UBS such that immediate injunctive relief is necessary and warranted.

20.     By this action, UBS seeks temporary and preliminary injunctive relief against the actions of Defendants pursuant to the valid and enforceable contractual agreements between UBS and each Defendant, as well as the statutory and common law of Florida.

21.     UBS also seeks expedited discovery in this matter in order to preserve and protect its proprietary information from actual and threatened misappropriation by Defendants, as well as

---

[2] As required by securities industry rules, UBS is simultaneously filing an arbitration claim for permanent injunctive relief and damages against Defendants at FINRA Dispute Resolution.

to safeguard its valuable relationships with key employees, customers, and referral sources from unlawful interference by Defendants. *See* Rule 26(d), Fed. R. Civ. P.

## PARTIES

22.     UBS is a Delaware corporation with its principal place of business in the State of New York. UBS is a securities broker-dealer and commodities futures commission merchant throughout the United States and a FINRA member firm.

23.     Until recently, Defendants were UBS employees.

24.     Defendant Andrew Plum is an individual who worked for UBS in Palm Beach County, Florida. Plum is a citizen of the United States and the State of Florida. Plum is domiciled at 19 Bay Harbor, Tequesta, Florida 33469-2003, which is where he makes his home and plans to make his home going forward indefinitely. Plum worked for UBS in Palm Beach County, Florida until his voluntary resignation on September 19, 2025. He currently works for Loxahatchee Capital in Palm Beach County, Florida.

25.     Defendant Thomas Cullen is an individual who worked for UBS in Palm Beach County, Florida. Cullen is a citizen of the United States and the State of Florida. Cullen is domiciled at 1471 N. Jeaga Drive, Jupiter, Florida 33458-8767, which is where he makes his home and plans to make his home going forward indefinitely. Cullen worked for UBS in Palm Beach County, Florida until his voluntary resignation on September 19, 2025. He currently works for Loxahatchee Capital in Palm Beach County, Florida.

26.     Defendant Kathleen Burke is an individual who worked for UBS in Palm Beach County, Florida. Burke is a citizen of the United States and the State of Florida. Burke is domiciled at 843 Fathom Road West, North Palm Beach, Florida 33408, which is where she makes her home and plans to make her home going forward indefinitely. Burke worked for UBS in Palm Beach

County, Florida until her voluntary resignation on September 19, 2025.  She currently works for Loxahatchee Capital in Palm Beach County, Florida.

27.     Defendant Taylor Marsh is an individual who worked for UBS in Palm Beach County, Florida.  Marsh is a citizen of the United States and the State of Florida.  Marsh is domiciled at 1602 SW Pine Land Way, Palm City, Florida 34990-2778, which is where he makes his home and plans to make his home going forward indefinitely.  Marsh worked for UBS in Palm Beach County, Florida until his voluntary resignation on September 19, 2025.  He currently works for Loxahatchee Capital in Palm Beach County, Florida.

**JURISDICTION AND VENUE**

28.     The Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interests and costs.

29.     This Court has personal general jurisdiction over Defendants because Defendants Plum, Cullen, and Burke are residents of Palm Beach County, Florida, and Defendant Marsh is a resident of Martin County, Florida.

30.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because each Defendant resides in this judicial district or is subject to personal jurisdiction in this Court, and because a substantial part of the events giving rise to UBS's claims occurred in this judicial district.

31.     The merits of this dispute are subject to mandatory arbitration before the Financial Industry Regulatory Authority ("FINRA"). However, under Rule 13804 of the FINRA Code of Arbitration Procedure, UBS is exercising its right to seek preliminary injunctive relief in this Court. In compliance with the FINRA Code, UBS is filing a Statement of Claim with FINRA against Defendants and their new employer, Loxahatchee.

## DEFENDANTS' FORMER UBS EMPLOYMENT

32.     Defendants were a highly successful financial advisor team at UBS. At the time of their resignation, Defendants were responsible for managing $1.4 billion in assets for UBS clients. Defendants generated approximately $9 million in revenue for UBS in the twelve months prior to their resignation.

33.     As noted above, however, a significant portion of the assets managed by Defendants were inherited from senior UBS financial advisors as part of the ALFA program. These "Legacy FAs" had been teammates of Defendants and had exited the securities industry in the recent past.

34.     In connection with the ALFA program that enabled Defendants to become the highly successful team that they were, Defendants were required to sign agreements with non-solicitation covenants, including the ALFA Receiving FA Agreements for the clients they inherited from their former colleagues.

35.     The ALFA program provides benefits to the Legacy FA beyond the peace of mind of handing off clients in an orderly fashion to the Receiving FA. The Legacy FA also receives payments over a period of five years based on the revenues generated by the ALFA Accounts. The ALFA program thus provides income to the Legacy FA after their separation from UBS.

### *The 2019 and 2022 ALFA Receiving FA Agreements for Plum*

36.      On December 1, 2019, Plum executed an ALFA Receiving FA Agreement (the "2019 ALFA Receiving FA Agreement," Exhibit A hereto) with respect to the UBS clients he was inheriting from a Legacy FA (the "2019 Legacy FA"). The 2019 Legacy FA had been a member of the 440 Group financial advisor team for a number of years before deciding to exit the financial services industry under the ALFA program.

37.     The 2019 ALFA Receiving FA Agreement contained a non-solicitation covenant under which Plum agreed not to solicit UBS clients with ALFA Accounts to transition their accounts away from UBS during the "Restricted Period." Specifically, the non-solicitation covenant provided as follows:

> Non-Solicitation. You also agree that during the Restricted Period you will not directly or indirectly solicit or interfere with any client who maintains or maintained an ALFA Account. Your agreement `not to solicit' includes but is not limited to your agreement not to initiate, whether directly or indirectly, any contact or communication of any kind whatsoever, for the purpose of inviting, encouraging or requesting a client or that may have the effect of inviting, encouraging or requesting a client to transfer any account from the UBS Group to you or any other entity or person; to open a new account with you or any other entity or person; or to discontinue the client's business relationship with the UBS Group.
>
> ***
>
> You understand that the terms of this section ('Non-Disclosure and Non-Solicitation') are material to the UBS Group and, therefore, if a court or arbitration panel of competent jurisdiction rules that you have breached the terms of this section, you agree that damages in the event of breach of this section would not be possible to ascertain. Therefore, you also agree that in addition to and without limiting any other remedy or right the UBS Group may have, it shall have a right to an injunction or other equitable relief enjoining any such breach or prospective breach. The existence of this right shall not limit any other rights and remedies at law or in equity. The UBS Group shall not be required to post any bond in connection with the foregoing. For the avoidance of doubt, the restrictions set forth herein are in addition to and not in lieu of any post-employment restrictions set forth in any plan rules governing awards, and nothing in this Agreement limits the terms and conditions of the applicable plan rules

See 2019 ALFA Receiving FA Agreement (Ex. A hereto) at p. 2.

38.     The Restricted Period during which Plum agreed not to solicit clients with ALFA Accounts is defined as the Start Date through one year from the End Date. Under the 2019 ALFA Receiving FA Agreement, the Start Date is designated as December 1, 2019, and the End Date is designated as November 30, 2024. Thus, the Restricted Period under this agreement continues

through November 30, 2025. Id. at p.1 and p.2, fn 3.

39.     The 2019 ALFA Receiving FA Agreement also prohibits Plum from using, maintaining, taking, or disclosing any UBS Confidential Information other than in the course of performing his UBS employment duties. Id. Confidential Information is defined as including, but not limited to, "any non-public information concerning UBS, its financial data, strategic business plans, products and product development, services, client relationships and prospective client relationships, client lists and contact information, client information (including but not limited to its clients' past and present financial conditions, investment practices, preferences, activities, objectives and plans and other client data you obtained while in our employ), marketing plans, and any other trade secrets or confidential or proprietary information." Id. at Appendix A, page i.

40.     On March 24, 2022, Plum executed an ALFA Receiving FA Agreement (the "2022 ALFA Receiving FA Agreement," Exhibit B hereto) with respect to the UBS clients he was inheriting from a second Legacy FA (the "2022 Legacy FA"). The 2022 Legacy FA had joined the 440 Group financial advisor team several years before for the specific purpose of transitioning his clients to Defendants and exiting the financial services industry under the ALFA program.

41.     The 2022 ALFA Receiving FA Agreement contained non-solicitation and confidentiality restrictions that are identical to the provisions quoted above, except that the Restricted Period is defined as the Start Date through the last to occur of the following: one year from (i) the date on which the Receiving FA's employment terminates with UBS for any reason

whatsoever and (ii) the End Date as set forth in the agreement. 2022 ALFA Receiving FA Agreement at p. 2, fn. 3. The Start Date is designated as April 1, 2022 and the End Date is designated as March 31, 2027. Thus, the Restricted Period under this agreement continues through March 31, 2028. Id. at p.1 and p.2, fn 3.

### *The 2023 ALFA Receiving FA Agreements for Plum, Cullen and Burke*

42.     On April 24, 2023 (Plum) and April 27, 2023 (Cullen and Burke), Defendants Plum, Cullen, and Burke each executed an ALFA Receiving FA Agreement (the "2023 ALFA Receiving FA Agreements," Exhibit C – E hereto) with respect to the UBS clients they were inheriting from a third Legacy FA (the "2023 Legacy FA"). The 2023 Legacy FA had been a longtime member of the 440 Group financial advisor team before deciding to exit the financial services industry under the ALFA program.

43.     The 2023 ALFA Receiving FA Agreement contained non-solicitation and confidentiality restrictions that are substantially identical to the provisions quoted above, except that 2023 ALFA Receiving FA Agreements added appendices for employees in California, Colorado and Illinois and specified that the restrictions were modified as set forth in the applicable appendices for employees in those states.

44.     The 2023 ALFA Receiving FA Agreements defined the Restricted Period as the Start Date through one year from the End Date. The Start Date is designated as May 1, 2023, and the End Date is designated as April 30, 2028. Thus, the Restricted Period under this agreement continues through April 30, 2029. Id. at p.1 and p.2, fn 3.

### _Financial Advisor Team Agreement signed by all Defendants_

45.     On August 20, 2024, each Defendant signed a Financial Advisor Team Agreement ("Team Agreement," a copy of which is attached as Exhibit F hereto). In the Team Agreement, each Defendant agreed that for one year from termination of employment he or she would not "solicit any clients that were serviced by the Team" except for any client accounts he or she "introduced to the Team, either at its inception or during its existence." Team Agreement, p. 2, Section 5.

46.     The Team Agreement included a definition of "solicitation" as follows: "'Solicit' means initiating (directly or indirectly) any kind of contact or communication for the purpose (or effect) of inviting, encouraging or requesting a client: (i) to transfer account(s) from the Firm or any other UBS entity; (ii) to open a new account with another entity; or (iii) to otherwise discontinue the client's existing business relationship with the Firm or any other UBS entity." Id. at p.2, Section 8.

### _UBS Policies Regarding Confidentiality of Information_

47.     As UBS financial advisors and employees, Defendants had access to confidential UBS information relating to, among other things, client names and contact information, client investment information and account performance reporting, client financial data, and client estate planning information, to name a few.

48.     Throughout their UBS employment, Defendants repeatedly acknowledged the confidentiality of information concerning UBS's clients. Each advisor was provided, and was required to read and comply with all firm policies and procedures, including UBS's Code of Conduct and Ethics ("the Code of Conduct"). (See Code of Conduct, attached hereto as Exhibit G.)

49.     A financial advisor's agreement to comply with UBS's policies and procedures, including the Code of Conduct and other policies designed to ensure the confidentiality and security of UBS's confidential client and business information, is a condition of his or her continued employment with UBS.

50.     In addition, Defendants were required to annually certify to UBS that they fully complied with and adhered to firm policies, including those contained in the Firm's Code of Conduct and Business Ethics and all other applicable firm policy manuals, Compliance Bulletins, Guidelines, and Directives; as well as the laws, rules, and regulations that govern or are otherwise applicable to the financial services industry.

### *Defendants Print Thousands of Pages Prior to Resigning*

51.     As noted above, in the lead up to their coordinated resignations, Defendants or their subordinates printed thousands of pages of documents containing UBS's confidential information.

52.     To wit, on September 8, 2025, team sales assistant Joan Davis systematically printed over 1,100 pages of STVData pdfs, which are UBS client statements. The print log shows the following printing by Ms. Davis that day:

| JE  838 | 09/08/2025 11:22:23 | STVData.pdf | P-2044247 | 188 |
|---------|---------------------|-------------|-----------|-----|
| JE  838 | 09/08/2025 11:26:49 | STVData (1).pdf | P-2044247 | 204 |
| JE  838 | 09/08/2025 11:34:39 | STVData (3).pdf | P-2044247 | 180 |
| SE  039 | 09/08/2025 12:20:09 | Microsoft Word - Printed Envelc | P-2044247 | 1 |
| SE  039 | 09/08/2025 13:45:41 | Microsoft Outlook - Memo Style | P-2044247 | 1 |
| SE  039 | 09/08/2025 13:54:50 | Microsoft Outlook - Memo Style | P-2044247 | 1 |
| CE  901 | 09/08/2025 15:01:05 | Comcast Stock_PAD.pdf | P-2044247 | 3 |
| CE  901 | 09/08/2025 15:01:27 | PAD ATT Dividend.pdf | P-2044247 | 2 |
| JE  838 | 09/08/2025 15:19:04 | UPS CampusShip _ UPS - Unitec | P-2044247 | 2 |
| JE  838 | 09/08/2025 15:37:34 | STVData (4).pdf | P-2044247 | 70 |
| JE  838 | 09/08/2025 15:39:36 | STVData (5).pdf | P-2044247 | 72 |
| JE  838 | 09/08/2025 15:40:30 | STVData (6).pdf | P-2044247 | 70 |
| JE  838 | 09/08/2025 15:41:24 | STVData (7).pdf | P-2044247 | 70 |
| JE  838 | 09/08/2025 15:47:02 | STVData (8).pdf | P-2044247 | 54 |
| JE  838 | 09/08/2025 15:52:27 | STVData (9).pdf | P-2044247 | 48 |
| JE  838 | 09/08/2025 15:53:32 | STVData (10).pdf | P-2044247 | 44 |
| JE  838 | 09/08/2025 15:54:30 | STVData (11).pdf | P-2044247 | 40 |
| JE  838 | 09/08/2025 15:56:07 | STVData (12).pdf | P-2044247 | 22 |
| JE  838 | 09/08/2025 15:57:03 | STVData (13).pdf | P-2044247 | 22 |
| JE  838 | 09/08/2025 15:57:53 | STVData (14).pdf | P-2044247 | 22 |
| JE  838 | 09/08/2025 15:58:40 | STVData (15).pdf | P-2044247 | 20 |

53.     On September 12, 2025, Defendant Kathleen Burke printed a 96-page IRA required minimum distributions report.

54.     The timing and volume of printing, coupled with the nature of the documents printed, strongly suggest they were printed and taken by Defendants to be used for their transition to Loxahatchee, rather than for any legitimate UBS business purpose.

55.     In response to UBS's post-resignation efforts to secure return of these documents, Defendants have denied retaining any copies. Defendants' denials are not credible given the timing and nature of the printing.

### *Defendants Simultaneous Resign from  UBS and Immediately Begin Soliciting UBS Clients and Utilizing UBS Confidential Information*

56.     On Friday, September 19, 2025, Defendants abruptly and simultaneously resigned from UBS, without providing any prior notice.

57.     Along with Defendants, all three sales assistants on the team resigned, leaving UBS without any remaining member of the team.

58.     That very same day, the Defendants and their assistants all became employed by Loxahatchee.

59.     Upon information and belief, Defendants have received a highly lucrative transition deal from Elevation Point pursuant to which they will be eligible to receive substantial incentive compensation based on the amount of UBS client assets they are able to move to out of UBS.

60.     All Defendants were subject to multiple written agreements or policies at the time of their separations from UBS prohibiting them, directly or indirectly, from (a) soliciting specified UBS clients and (b) possessing, disclosing, or using any confidential UBS client information.

61.     Despite this, Plum called the 2022 Legacy FA on Friday, Sept 19 after resigning and Plum apologized, stating that some of the 2022 Legacy FA's former clients would be going to

Loxahatchee.

62.     Plum also said the entire group/team is going "and so are my clients."

63.     Plum further told the 2022 Legacy FA that this "secret project" has been in the works for 8 months and that the new firm opened a new building for them.

64.     While UBS's investigation is ongoing, UBS has uncovered evidence that Defendants are contacting UBS clients with ALFA Accounts. For example, UBS found an email that a client with an ALFA Account sent to Defendant Plum at his UBS email address on Sunday, September 21, indicating that Plum had called the client:



65.     Indeed, the evidence gathered at this early stage establishes that Defendants began directly targeting UBS's customers in violation of their continuing legal obligations at least no sooner than immediately following their resignations on September 19, 2025.

66.     Upon information and belief, Defendants have used confidential UBS customer information to facilitate their communications with clients in person and by cell phone calls, texts, and emails.

67.     As noted above, several clients that Defendants serviced while at UBS have already moved their business to Defendants' new firm, or informed UBS that they intend to do so, and have notified UBS that they already have been contacted by Defendants.

68.     As of the date of filing, UBS has received electronic account transfer instructions

to transfer more than $200 million in client assets formerly managed by Defendants at UBS to Defendants' new firm via the Automated Customer Account Transfer Service system ("ACAT")

69.     Upon information and belief, Defendants' misconduct as set forth above is merely the first to be discovered, and represents the tip of the iceberg in terms of their intentional breaches of their obligations to UBS.

70.     Prior to filing this case, UBS attempted to secure compliance by Defendants with their post-employment obligations. On September 21, 2025, counsel for UBS sent a letter to the attorney for Defendants (a copy of which is attached hereto as Exhibit H), reminding them of their continuing obligations to UBS and insisting that they refrain from soliciting UBS customers as defined in their agreements, or misappropriating UBS confidential information.

71.     In response to this reminder of obligations letter, counsel for Defendants stated that Defendants had not and would not "solicit" clients and did not take any UBS confidential information, but appeared to acknowledge that Defendants were contacting clients to make purported announcements using public record information.

72.     Absent injunctive relief, UBS has no adequate remedy at law.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract - Non-Solicitation of Clients -**
**Against All Defendants)**

73.     UBS realleges and incorporates the preceding paragraphs as if set forth fully herein.

74.     Each Agreement containing a non-solicitation covenant signed by Defendants ("the Soliciting Defendants") is valid and enforceable.

75.     Each Soliciting Defendant violated his or her non-solicitation covenants, the provisions of which are set forth above, by soliciting, servicing and/or otherwise interfering with UBS's relationships with its clients.

76.     All of the Agreements were supported by adequate consideration, as set forth above, and contain reasonable post-employment restrictions that are necessary to protect UBS's legitimate business interests.

77.     UBS fully performed its obligations under the Agreements containing non-solicitation covenants.

78.     As direct and proximate result of the Soliciting Defendants' breaches of their non-solicitation agreements, UBS has suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law.

79.     UBS will continue to suffer this harm unless and until the Soliciting Defendants are restrained from their current conduct and are compelled to abide by the terms of their non-solicitation covenants.

**SECOND CLAIM FOR RELIEF**
**(Breach of Contract- Confidential Information- Against All Defendants)**

80.     UBS realleges and incorporates the preceding paragraphs as if set forth fully herein.

81.     Each agreement containing a confidentiality covenant signed by each Defendant is valid and enforceable.

82.     Under the confidentiality covenants, Defendants are prohibited from directly or indirectly using, disseminating or disclosing UBS's Confidential Information, as the term is defined in the agreements set forth above, except as required to carry out their duties as an employee of UBS.

83.     Upon information and belief, each Defendant has used or disclosed, or threatens to use or disclose, UBS's Confidential Information, in violation of his or her confidentiality covenants.

84.     UBS fully performed its obligations under the Agreements set forth above, which contain confidentiality covenants.

85.     As direct and proximate result of Defendants' breaches of the confidentiality covenants, UBS has suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. UBS will continue to suffer this harm unless and until Defendants are restrained from their current conduct and are compelled to abide by the terms of the confidentiality covenants.

### THIRD CLAIM FOR RELIEF
**(Breach of Fiduciary Duties - Against All Defendants)**

86.     UBS realleges and incorporates the preceding paragraphs as if set forth fully herein.

87.     Each Defendant was employed by UBS in a position of trust and confidence.

88.     By virtue of his or her position at UBS, each Defendant owed a fiduciary duty and a duty of loyalty to UBS both during and after his or her employment and was obligated not to divert UBS's business in which it had a tangible expectancy, and not to subvert or misappropriate UBS's Confidential Information.

89.     Each Defendant breached his or her fiduciary duties owed to UBS by directly or indirectly soliciting and/or diverting UBS's clients and business opportunities, in which it had a tangible expectancy, to Loxahatchee, a direct competitor, and/or subverting or misappropriating UBS's Confidential Information and Trade Secrets.

90.     As a direct and proximate result of Defendants' breaches of their fiduciary duties, UBS has suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. UBS will continue to suffer this harm unless and until Defendants are restrained from taking further actions in breach of their fiduciary duties to UBS.

**FOURTH CLAIM FOR RELIEF**
**(Tortious Interference with Existing and**
**Prospective Business Relationships - Against All Defendants)**

91.     UBS realleges and incorporates the preceding paragraphs as if set forth fully herein.

92.     As a result of their employment with UBS, Defendants were intimately familiar with, and had detailed knowledge concerning, the business relationships that existed between UBS and certain clients.

93.     The Defendants intentionally, with malice, and without privilege or justification, interfered with UBS's business relationships with certain clients using unfair or improper means, and/or with the intent to interfere with such relationships.

94.     UBS possesses a protectable interest in its contracts and relations with its clients, in that it has a reasonable expectation of their continued association with UBS.

95.     Defendants' conduct was undertaken with malice, or in knowing disregard of or indifference to, the rights and interests of UBS.

96.     As a direct and proximate result of Defendants' interference, jointly and severally, UBS suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law.

97.     UBS will suffer this harm unless and until Defendants are restrained from their respective current and intended conduct.

**FIFTH CLAIM FOR RELIEF**
**(Misappropriation of Confidential Information - Against All Defendants)**

98.     UBS realleges and incorporates the preceding paragraphs as if set forth fully herein.

99.     As senior employees of UBS, each Defendant learned or had access to UBS's Confidential Information.

100.     Upon information and belief, each Defendant has used or disclosed, or threatens to

use or disclose, UBS's Confidential Information.

101.    Upon information and belief, Defendants are presently misappropriating UBS's Confidential Information, and using such information to the detriment of UBS.

102.    As a direct and proximate result of Defendants' conduct, jointly and severally, UBS has suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. UBS will suffer this harm unless and until Defendants are restrained from their current and intended conduct.

WHEREFORE, UBS demands judgment for temporary and preliminary injunctive relief, pending FINRA arbitration, as follows:

A.    Enjoining and restraining Defendants, and any person or entity acting in concert with them or under their supervision, through the end of the restricted periods set forth in Defendants' respective agreements, and as extended during any period that Defendants have breached their obligations to UBS, from violating the non-solicitation covenants set forth in their respective agreements;

B.    Enjoining and restraining Defendants, and any person or entity acting in concert with them or under their supervision, from possessing, using, disclosing or disseminating UBS's Confidential Information and requiring them to return to UBS any UBS Confidential Information in their possession, custody or control;

C.    Enjoining Defendants, and any person or entity acting in concert with them or under their supervision, from any other actions in violation of any Defendant's contractual obligations or fiduciary duties owed to UBS; and

D.      Granting UBS its costs and disbursements incurred in connection with this litigation, including attorneys' fees, together with such other further relief as the Court may deem just and proper.

Respectfully submitted this 29th day of September, 2025.

By: _s/  Jennifer M. Taylor_
   Jennifer M. Taylor, Esq.
   Florida Bar No. 174203
   Email: _jennifer.taylor@jacksonlewis.com_
   **JACKSON LEWIS P.C.**
   One Downtown, Suite 2300
   1 SE 3rd Avenue
   Miami FL 33131
   Telephone: (305) 577-7600

   *Attorneys for Plaintiff*

## <u>Verification of Complaint for Injunctive Relief</u>

Pursuant to 28 U.S.C. §1746, Suzann R. Zadanosky does hereby state as follows:

1. I am over 21 years of age, and I am under no legal or mental disability or duress.

2. I am the Market Director for UBS Financial Services Inc. with responsibility for UBS branch offices in West Palm Beach, Palm Beach Gardens, Stuart, and Vero Beach, Florida. I am authorized to make this declaration on behalf of UBS Financial Services Inc.

3. I hereby certify that I have read the foregoing Verified Complaint for Injunctive Relief, and that the statements set forth therein are true and accurate and based on my own personal information.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on September 29, 2025

_Suzann Zadanosky_
Suzann R. Zadanosky